[Civ. No. 13319. First Dist., Div. One. Apr. 17, 1947.]

A. BANDONI, Respondent, v. VERNON C. WALSTON et al., Appellants.

Claude N. Rosenberg and Bacigalupi, Elkus & Salinger for Appellants.

Boccardo & Williams for Respondent.

WARD, J.—This is an appeal from the judgment of the Superior Court of Santa Clara County providing that plain-

tiff recover from "Vernon C. Walston, C. P. Hoffman and Claire V. Goodwin, etc., et al. the sum of Four Thousand & 00/100 ($4,000.00) — Dollars, with interest."

The complaint alleges that on or about September 27, 1945, plaintiff purchased from defendant Walston, Hoffman & Goodwin, a copartnership, and the individual defendants who are partners thereof, 1,100 shares of Kaiser-Frazer Corporation stock for $11,000, which sum defendants receipted for in writing, and agreed in writing to deliver 1,100 shares to plaintiff. It further alleged that defendants delivered 100 shares; that demand has been made for delivery of 1,000 shares; that the reasonable market value of 1,000 shares on the date that delivery thereof should have been made was $14 per share, and that plaintiff has been damaged in the sum of $4,000.

Defendants' answer denied that plaintiff purchased 1,100 shares, but admitted that on or about September 27, 1945, plaintiff paid to defendants $11,000 which was receipted for in writing, and that defendants delivered 100 shares—when the market value was $14 per share. As an affirmative defense, defendants alleged that on or about September 26, 1945, plaintiff deposited $11,000 with defendant Walston, Hoffman & Goodwin, and informed said defendant that he desired to purchase some shares of Kaiser-Frazer Corporation stock at $10 per share; that plaintiff was informed that said defendant would be unable to sell him more than 100-200 shares; that thereupon plaintiff stated that he would purchase and accept delivery of such number as said defendant elected to sell him; subsequently, on September 28, 1945, said defendant elected to sell plaintiff 100 shares at $10 per share and so informed plaintiff in writing.

Plaintiff, a rancher in Santa Clara County, testified that he communicated by telephone with Guy E. Marshall, the general manager of the San Jose office of the defendant firm, informing Marshall that he would like to have 1,000 shares of Kaiser-Frazer Corporation stock, to which Marshall replied "You can have all you want." Defendants' testimony showed his reply to be, " 'I have a check for $11,000, I'll take 1100.' That is how we arrived at the amount of 1100 shares." Marshall sent his secretary for said check which constituted the proceeds of another transaction. This check and the receipt for same "For Account of Attilio Bandoni . . . for 1100 Kaiser-Frazer Corp.," constitute the agreement "in writing" upon which the action was brought.

The evidence also shows that plaintiff requested a friend to inform Marshall that the order be cut down to 500 shares, and that this message was delivered. There is a conflict in the evidence as to whether subsequently plaintiff ordered 1,100 shares from Marshall. Plaintiff testified that when he received only 100 shares of Kaiser-Frazer Corporation stock, he demanded the balance of 1,000 shares. He admitted that he received a confirmation of sale of only 100 shares.

The evidence submitted by the defense tended to contradict the evidence of plaintiff. During the cross-examination of plaintiff, without the presence of the jury, defendants' counsel made an offer to prove that in past transactions where Bandoni purchased a security he received a confirmation of the sale, and that in each instance where he made a payment he received a receipt. The trial court refused to allow the evidence of other transactions even though it was argued that such evidence would show that plaintiff realized the distinction between a receipt for money and a confirmation of sale.

Marshall denied that he had said Bandoni could have as much stock as he desired. On the contrary, he testified: "I told Mr. Bandoni at the time that there had been a lot of activity and inquiries about the stock, and in my opinion, I would do well if I got him 100 or 200 shares of stock, that I could not guarantee to make any delivery to him." Plaintiff's objections were sustained as to the propriety of questioning Bandoni as to his knowledge of an oversubscription of the stock.

Vernon C. Walston, a member of the defendant firm, testified that the firm sold Kaiser-Frazer Corporation stock at $10 a share as indicated in the prospectus, and that in a few days, in over-the-counter transactions, it went up to $14 a share. The court sustained an objection to questioning Walston as to whether he purchased any Kaiser-Frazer stock himself. Walston's testimony sheds light on prior dealings of the parties. "We're under the regulations of the Federal Reserve Bank in the extension of credit. We have had, a month or so prior to this transaction, repeated violations by Mr. Bandoni of payments. I had notified Mr. Marshall that we would henceforth not accept any orders from Mr. Bandoni unless the funds were on deposit with us." It appears that although plaintiff was financially responsible, his life as a rancher delayed his payments to defendant firm. Walston testified: "We accepted this check from him, not as an agreement that we had sold him

1100 shares, because . . . At the time we received that check from Mr. Bandoni, we could not sell the stock. We did not know how much stock we were going to get. It wasn't until the next day that we were advised by the underwriters how much stock they allocated to us. Then, we attempted to—we did allocate that in full among the various orders that we had. We naturally favored customers that had had proper dealings with us in that allocation.''

Daniel J. Cullen, sales manager and a partner of the firm, was called as a witness. The defense offered to prove that Bandoni understood the significance of the various documents introduced in evidence. The court sustained an objection. The record shows the following: ''Mr. Boccardo: Counsel, will you stipulate that we can go into whether or not the partners bought any themselves? Mr. Rosenberg: No, I won't go into that, or any other customer, because that's a matter of privacy, which you're not entitled to inquire into. . . . Q. Will you state whether or not, Mr. Cullen, on September 27th, 1945, the firm of Walston, Hoffman & Goodwin had any shares of Kaiser-Frazer stock? I'll withdraw that. State whether or not on September 27th, 1945, the defendant firm of Walston, Hoffman & Goodwin allocated to its customers all of the shares of stock which it received out of the underwriting agreement, pertaining to Kaiser-Frazer stock?'' An objection by defendants was sustained.

During the course of the trial the court made the following statement to the jury: ''. . . whatever the attorneys may say is not evidence, and you're not bound to decide this case on what Counsel say. You're to decide this case solely on the testimony of witnesses, and whatever arguments Counsel may make, if they are of any help to you, you may follow them, but whatever statements that the attorneys make is not evidence.''

The evidence shows that Bandoni sold his 100 shares of Kaiser-Frazer stock a few days after the original transaction at a profit, but before the case was submitted the court expressed the opinion that such evidence had nothing to do with the case. The same ruling applied to an alleged profit made on the sale of Bank of America stock which defendants claim was purchased with the remaining portion of the $11,000 after 100 shares of Kaiser-Frazer were purchased.

The following testimony is in the record: ''Q. And then when you finally got ahold of Mr. Marshall after this, you received this confirmation, now, what did you say to him on

that occasion over the telephone? A. Well, I says I didn't get my stock, I was going to sue them. Q. And what did Mr. Marshall say? A. Well, he says, I didn't have a leg to stand on, and I said maybe I was kidding.''

Defendants specify as error that ''1. The court erred in instructing the jury. 2. The court erred in excluding evidence which was admissible to explain the receipt and determine the intention of the parties. 3. Opposing counsel was guilty of prejudicial misconduct in commenting on evidence excluded by the trial court.''

■ Defendants claim that the following instruction is erroneous as being a misstatement of the law. ''A contract must be mutual. It must be binding upon both parties or neither. There is no such thing as a contract which is binding upon one party to it and not binding upon the other.

''If you find from the evidence in this case that Mr. Bandoni was bound to purchase the stock; that is, that he was obligated to purchase at a given price the 1100 shares of Kaiser-Frazer Corporation stock involved in this action, then you are instructed that the defendants were bound and obligated to sell the stock to Mr. Bandoni at the price stated.''

In the paragraph preceding the last instruction, the court instructed that ''When a buyer agrees to buy a thing and the seller promises to sell it, a binding contract is made,'' indicating that the court treated the case as involving a bilateral contract. Whether or not the court erred in instructing on mutuality of obligation depends upon whether or not a bilateral contract had been entered into by the parties to this action. Conceivably, plaintiff's offer to purchase Kaiser-Frazer Corporation stock was an offer for a unilateral contract—in exchange for a broker's act of getting the desired stock, the offeror promises to pay the purchase price.

■ The doctrine of mutuality of obligation is inapplicable to unilateral contracts. (6 Cal.Jur. 213; 1 Williston on Contracts, 19-20.) ■ It is also conceivable that plaintiff's offer was an offer for a bilateral contract—in exchange for the broker's promise to get the desired stock, the offeror promises to pay the purchase price. Plaintiff's testimony supports this view of the case. A court should interpret an offer as contemplating a bilateral rather than a unilateral contract. (Restatement of the Law, Contracts, § 31; 1 Williston on Contracts, 76.) It does not appear that the court committed error in instructing as to mutuality of obligation.

The only other instruction which need be considered is attacked by defendants as shifting the burden of proof: "If the jury believes from the preponderance of the evidence in this case, that the plaintiff made the defendants an offer to buy 1100 shares of the stock of the Kaiser-Frazer Corporation for the sum of $11,000 and delivered to the defendants, at or about the time he made that offer, a check for the sum of $11,000, which the defendants received, accepted and cashed, then, in the absence of a *full and satisfactory explanation*, the jury should find that the acceptance of the check constituted an acceptance of the plaintiff's offer to buy the 1100 shares of stock, and that a binding contract was then created by which defendants became obligated to sell and deliver to plaintiff 1100 shares of that stock." (Emphasis added.) The instruction places a burden on defendants greater than the law requires, namely, proof "according to the preponderance of evidence." (Code Civ. Proc., § 2061; *Pullen* v. *Heyman Bros.*, 71 Cal.App.2d 444 [162 P.2d 961].)

In *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], an expression similar to that used in the quoted instruction, namely, a requirement that "conclusive" evidence be introduced, together with other instructions upon the same subject, was held to require a reversal. In the Hobart case the ground for reversal, namely, the requirement of conclusive evidence, is coupled primarily with an instruction that a party has an "absolute right" to rely upon an expressed statement of an existing fact made by one "with full means of knowledge." The instruction that a plaintiff had an absolute right to rely upon a statement of an existing fact, the truth of which was known to the maker of the statement, was error. The court said (p. 447) : "Reliance must be justifiable. . . ." In the present case the jury was instructed that the explanation must be not only satisfactory, *but* it must be "full," which was merely another way of saying that the evidence which the defendants are called upon to present must be clear, complete, conclusive and of the highest degree, that is, *absolutely* satisfactory. In a civil case the burden of going forward with an explanation does not impose the extra burden of proving the explanation beyond a reasonable doubt, unless a statute specifically so provides, which is not true in this case. A full and satisfactory evidentiary explanation is equivalent to proof beyond a reasonable doubt (17 Words and Phrases, Perm. ed., p. 772), except in such matters where the statute sets forth the quality and quantity

of evidence necessary as proof in a particular action (Cumulative Annual Pocket Part, 17 Words and Phrases, Perm. ed., p. 123).

In the Hobart case the Supreme Court commented upon the fact that the jury had requested certain clarifying instructions. The Supreme Court did not quote the instruction requested by the jury but stated (p. 449): "It is obvious that the jury was confused in a close case in which the evidence was sharply conflicting. The errors in the instructions related to matters vital to defendants and, when considered together, must be regarded as prejudicial. . . . Since the judgments must be reversed, and as it is unlikely that the errors complained of will be repeated upon a retrial of the case, it is unnecessary to discuss them here." It is not necessary in the present case to discuss several instructions containing statements erroneous to a minor degree. It may be assumed that upon a retrial the errors will not be repeated.

■ Was the error in the last instruction prejudicial? The answer depends upon the facts. The closeness of the case on its facts, when considered with the Pullen and Hobart cases, and the pronounced views in the opinion in the latter case, together with other errors which will be referred to, necessitates a reversal of the judgment.

The second point urged on appeal is that the trial court *committed reversible error* in excluding certain evidence offered by defendants. It is admitted that the check for $11,000 and the receipt for same "For Account of Attilio Bandoni . . . for 1100 Kaiser-Frazer Corp.," constitute the agreement "in writing" upon which suit was brought. Defendants argue that it was pertinent to inquire not only what plaintiff understood the transaction to be, but also what defendants understood it to be. (Civ. Code, § 1649.) ■ Evidence introduced by defendants that plaintiff knew the issue of Kaiser-Frazer Corporation stock was oversubscribed, was a proper subject for cross-examination if for no other reason than to test the credibility of the witnesses. ■ Evidence of the extent of plaintiff's knowledge of the distinction between a receipt for money and a confirmation of sale should have been admitted as indicating whether the receipt was in fact a contract of sale.

*Citizens Nat. T. & S. Bk. v. Arrowhead Springs Beverage Co.*, 126 Cal.App. 550 [14 P.2d 821], involved an action to recover money paid under a stock subscription agreement. In

addition to the subscription agreement, two receipts were offered and admitted in evidence. The first read: " 'Received of Annie W. Stimson . . . check for the sum of Thirty Thousand Four Hundred Dollars on account of his (sic) subscription for 3040 shares of . . . Preferred shares of said Company on the terms set forth in his (sic) subscription contract . . . [Signature] . . . and seven hundred shares of Common.' " The second receipt read: " 'Received of Annie W. Stimson . . . 152 shares of . . . for which I agree to deliver to her 3040 shares of the preferred stock and 700 shares of the common stock of . . . or I agree to return the sugar stock received.' " The issue was whether the subscription agreement included the sale of 700 shares of common stock. The parties differed as to whether the two receipts could be looked to, to determine this issue. The court, at page 554, described the first receipt in the following terms: " [it] is but a bare acknowledgment that the agent received a check it is a mere receipt," citing *Greer* v. *Los Angeles Athletic Club*, 84 Cal.App. 272 276 [258 P. 155]. The second receipt, however, is described as "both a receipt and a contract because, in addition to acknowledging receipt of the stock, the agent agrees to deliver specified stock therefor or to return the stock so received." The receipt here involved, set-out *supra,* resembles the first of the two receipts involved in the Citizens Bank case. It is insufficient and incomplete as an agreement to sell.

It is true that "testimony involving a collateral issue will not be permitted where such inquiry, in its probative bearing on the main issues, is not worth the time and necessary complication of issues involved." (10 Cal.Jur. 805.) Whether a contract of sale of 1,100 shares of Kaiser-Frazer Corporation exists, is a vital question in this case. The evidence offered by defendants was "worth the time and necessary complication of issues involved."

In view of the foregoing it is unnecesary to consider defendants' objection to the exclusion of certain evidence relative to the function of the cashiering department which issued the receipt.

It is now proper to consider another ground for reversal, namely, misconduct on the part of plaintiff's attorneys. There is evidence offered by the defendants that the stock was oversubscribed. The court prohibited plaintiff from asking any questions on cross-examination as to why it was oversubscribed. This was error. Such evidence was

admissible. The main issue presented to the trial court was whether a binding contract was entered into for 1,100 shares. Defendants were contending that no such contract was entered into, and that there was only an offer to buy 1,100 shares or so many shares as defendants might allocate to plaintiff. The court was entitled to consider the legal effect of the contrasting interpretations. If defendants' contention was correct, and if the brokers could have refused to allocate any shares at all to plaintiff, and if the reason that no such shares were allocated was that members of the firm or employees subscribed and took advantage of the raise in price, the trial court was entitled to know that fact in determining how to interpret the contract. Obviously, an interpretation that is fair and equitable is to be preferred to one that places all the burden on one side and confers all the rights on the other.

But although this evidence was admissible the trial court ruled it inadmissible. Plaintiff nevertheless persisted in referring to it after repeated admonitions by the court. General accusations of dishonesty on the part of defendants were made, as well as the direct charge that defendants had purchased individually and otherwise the Kaiser-Frazer stock for their own benefit, thus causing an oversubscription to the detriment of plaintiff who was unable, on account of the acts of defendants, to secure the requested number of shares.

An example of general charges of dishonesty appears in the following from the opening argument of counsel for plaintiff: ". . . it's a skin game. It's a case of heads I win, and tails you lose. It's a stock broker's trick that they're trying to practice on this man. They're trying to put themselves in the position where they have the orders and the money, which will fortify themselves, so that they can get every share of stock they want sold at that minimum price, regardless of what happens, and then if they're fortunate and the stock issue appeals to the public, and there are a lot of subscriptions to it, they can say, 'Oh, it's too bad, you know you ordered 1100 shares and paid $11,000, but we'll just dish you out 100 shares, and we'll call it square. That's all right. You've got nothing against us at all. There's no contract. You can't hold us.' Now, is that legitimate business? . . . do you think there's any faithfulness in a situation where a man puts up his money, and orders stock, and they can hold him if the

stock goes down, and yet if the stock goes up, he doesn't get the benefit of it?''

██ Relative to the direct charge that the members of the defendant firm had bought the stock and caused the oversubscription the following appears in the opening argument: ''I asked Mr. Walston on the stand here, if he individually had bought any stock. The Court sustained an objection to the question. It wasn't answered, so there's no evidence that he did buy any stock, but, Ladies and Gentlemen of the Jury, *there's no evidence that he did not buy some of the stock*. There is no evidence that his partner, Mr. Hoffman, did not buy some of the stock. There is no evidence that his partner, Mr. Goodwin, didn't buy some of the stock. There's no evidence that this gentleman over here did not buy some of the stock, (referring to Mr. Cullen). In other words, if they thought that stock was going up they had an object in making a profit, maybe this oversubscription which they're complaining about here was due to the fact that the insiders put in their own individual orders for so much of the stock that there wasn't any left for their customers. Now, that's a fair inference from this situation.'' (Emphasis added.) The statement was assigned as misconduct. Thereupon counsel for plaintiff made the following statement: ''I've simply shown that there's no evidence to show here what was the cause of the oversubscription, and it's absolutely open to the inference of the Jury that the oversubscription was due to orders that were placed by the individual partners of this concern, and I respectfully submit, your Honor, that that's a perfectly legitimate offer.'' The court directed plaintiff's counsel to discontinue that line of argument.

Defendants' attorney in his argument replied to the foregoing charges of plaintiff's attorney in the following manner: ''I might say that he has undertaken, also, to anticipate some of the instructions that the Court is going to give you in this case. He neglected, however, to mention that one of the instructions that the Court is going to give you is that in this case you are not to be influenced by sympathy, prejudice, or passion of any kind. I mention that in light of his reference to dishonesty and unfairness in dealings, and his reference to the fact that in this transaction, this reputable firm of defendants was guilty of sharp practice and stockbrokers' tricks, and I submit to you that the only purpose of those remarks, and remarks of that category could possibly have would be to

inflame you against these defendants, and cause you, in the rendition of your verdict, to be influenced by some prejudice or some passion that he's attempted to create in your minds contrary to the law that he knows you're obligated to conform to in the discharge of your oaths as jurors. . . . Mr. Bandoni would have you believe that this firm agreed to sell him 1100 shares of stock. We deny that. I think the evidence all points the other way, but, at any rate, on September 28th he found out he was only getting 100 shares of stock. . . . Now, do you think that a man doing business with an investment concern, if he felt that they had cheated him out of $4,000 by violating their agreement with him, would continue doing business with that firm? You know that he wouldn't. Mr. Bandoni is a business man. That's utterly illogical, and still the evidence is uncontradicted that within two weeks after this transaction, he purchased, made another purchase of securities from the same concern, and then he ultimately sold those securities through the same concern, the same concern that was guilty of these dishonest practices, this stock-broker's trick, Mr. Bandoni continued to do business with. . . ."

In closing, defendants' attorney called attention to defendant Walston's testimony, "because I'm sure that there has been an attempt to create an impression that there was some ulterior purpose in these defendants not delivering this stock to Mr. Bandoni, and the *implication is,* that any stock they didn't deliver to him, they could *sell to somebody else for more money.* Here is Mr. Walston's testimony right here, 'We did allot that in full among the various orders that we had.' The testimony is uncontradicted, that whatever shares of stock that these defendants had to sell, they sold at $10.00 per share, and *I'll ask Mr. Williams* [plaintiff's counsel] to tell me, *what possible purpose,* or benefit, these defendants could gain by *not delivering* shares of stock *to Mr. Bandoni,* on which they'd make approximately $1.00 a share, *when they could only do one thing, and that's deliver them to somebody else* and only make $1.00 a share." (Emphasis added.)

The answer of plaintiff's counsel, after direction to discontinue argument with reference to whether defendants individually purchased the stock, exceeded the bounds of the question posed. He told the jury: "I'll tell you Ladies and Gentlemen, what benefit these people had in not delivering that stock to Mr. Bandoni. As a firm, they may have distributed that stock, but as individuals, I assure you, Ladies

and Gentlemen, and you can take that as an inference from the evidence here, that they individually were distributees of that allotment of stock." The attorney for defendants requested the court to instruct the jury to disregard that statement, but plaintiff's attorney enlarged to the jury the "inference that you can draw in this case." *During neither plaintiff's closing argument nor during the instructions of the court to the jury was an admonition given to disregard the remarks, nor was reference made to the rule that statements of counsel are not evidence.*

". . . instances of misconduct are the wilful bringing in or attempting to bring in of irrelevant, *previously excluded,* or incompetent evidence for the purpose of prejudicing the opposing party; the persistent pursuit of an incompetent course of questions. . . ." (Emphasis added.) (53 Am.Jur., pp. 360-361, § 459.) "While a large discretion is allowed an attorney in presenting his case, nevertheless, where, in doing so, he oversteps the bounds of propriety and fairness which should characterize his conduct as an officer of the court, such conduct, where not cured by a proper instruction, may, if proper and timely objection is made, be ground for a new trial or for reversal of the case by the reviewing court." (53 Am.Jur., p. 360, § 458.) As said in *People* v. *Ah Len,* 92 Cal. 282, 285 [28 P. 286, 27 Am.St.Rep. 103]: "It follows that the only safe and just rule to apply in such cases is to make it impossible for a party to derive any advantage from such misconduct of counsel by promptly granting a new trial to the adverse party, unless it is clear that the verdict was not affected thereby." The purpose of the injected remarks was so apparent that it is doubtful whether the jury could have obliterated the effect thereof if a proper admonition had been given. (*Mangino* v. *Bonslett,* 109 Cal.App. 205 [292 P. 1006].)

On the grounds of cumulative effects of error in an instruction, of exclusion of admissible evidence, and of prejudicial misconduct, the judgment is reversed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied May 17, 1947, and respondent's petition for a hearing by the Supreme Court was denied June 12, 1947. Carter, J., voted for a hearing.