Filed 6/16/15  In re Cellphone Termination Fee Cases CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **IN RE CELLPHONE TERMINATION FEE CASES.** | **A140302** |
| _____/ | **(Alameda County Super. Ct. No. RG03121510)** |

This consumer class action challenges wireless telephone carrier Sprint Spectrum, L.P.'s (Sprint) policy of charging early termination fees (ETF's) to consumers terminating service before defined contract periods expire.[1]  The latest chapter in this ongoing litigation concerns the retrial of Sprint's damages pursuant to our 2011 opinion in _Cellphone Termination Fee Cases_, _supra_, 193 Cal.App.4th 298.  On retrial, Sprint presented two alternate theories of damages: (1) lost profits damages, amounts remaining on the contracts plaintiffs breached; and (2) reliance damages, outlays Sprint made in reliance on plaintiffs' promise to remain customers through the duration of their

---

[1]     This case has generated several writ petitions (_Ayyad v. Superior Court_ (July 16, 2013, A139223) [nonpub. order]; _Sprint v. Superior Court_ (Dec. 13, 2012, A137207) [nonpub. order]; _Sprint Spectrum, L.P. v. Ayyad_ (June 23, 2008, A121870) [nonpub. order]) and the following appeals: _Cellphone Termination Fee Cases_ (June 24, 2014, A136818) [nonpub. opn.]; _Cellphone Termination Fee Cases_ (June 24, 2014, A138424) [nonpub. opn.]; _Ayyad v. Sprint Spectrum, L.P._ (2012) 210 Cal.App.4th 851 (_Ayyad_); _Cellphone Termination Fee Cases_ (2011) 193 Cal.App.4th 298; _Ayyad v. Sprint Spectrum, L.P._ (Dec. 3, 2009, A124082) [nonpub. order]; _Ayyad v. Sprint Spectrum, L.P._ (Nov. 23, 2009, A121948 [nonpub. opn.]; _Ayyad v. Sprint Spectrum, L.P._ (July 24, 2009, A122709 [nonpub. opn.].)  The named plaintiffs and representatives of the class of approximately 2,000,000 are Ramzy Ayyad, Jeweldean Hull, Christine Morton, Richard Samko, and Amanda Selby (plaintiffs).

1

contracts. The jury determined Sprint suffered $18,425,130 in lost profits damages and $0 in reliance damages.

Sprint moved for judgment notwithstanding the verdict (JNOV), contending the evidence was insufficient as a matter of law to support the verdict because uncontroverted evidence established it suffered $1.05 billion in lost profits damages and up to $772,405,316 in reliance damages, and because the court erred by admitting plaintiffs' expert testimony on lost profits. (Code Civ. Proc., § 629.)[2] Sprint also moved for new trial on lost profits and reliance damages on various grounds. The court denied Sprint's JNOV motion and Sprint's motion for new trial on reliance damages. The court granted Sprint's new trial motion on lost profits damages (§ 657, subds. (1), (3), (7)).

Plaintiffs appeal. They challenge the denial of their motion for directed verdict on Sprint's lost profits damages and contend the court erred by granting Sprint's motion for new trial on lost profits. Sprint cross-appeals. It contends the court erred by denying its JNOV motion and by denying its motion for a new trial on reliance damages.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2003, plaintiffs sued Sprint and other cellular telephone carriers.[3] (*Ayyad, supra,* 210 Cal.App.4th at p. 854.) As relevant here, plaintiffs alleged Sprint's ETF's violated the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.) and Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) and constituted unauthorized penalties (Civ. Code, § 1671). (*Ayyad, supra,* 210 Cal.App.4th at p. 854.) The trial court certified plaintiffs' claims as a class action and allowed Sprint to file a cross-complaint for breach of contract seeking monetary damages and equitable relief if the ETF's were found to be unenforceable penalties. (*Id.* at pp. 854-855.) In a month-long trial in 2008, the parties tried plaintiffs' claims and Sprint's cross-claims and setoff defense. (*Id.* at p.

---

[2]     Unless noted, all further statutory references are to the Code of Civil Procedure.

[3]     For a detailed procedural history of this litigation, see *Ayyad, supra,* 210 Cal.App.4th at pages 854 to 856 and *Cellphone Termination Fee Cases, supra,* 193 Cal.App.4th at pages 303 to 309.

2

855.)  Plaintiffs presented the majority of their case through their expert, Dr. Lee L. Selwyn.  (*Cellphone Termination Fee Cases, supra,* 193 Cal.App.4th at p. 305.)  Dr. Selwyn testified Sprint suffered $17,619,322 in lost profits from early terminations over the entire class period.  (*Id.* at p. 306.)

"[T]he judge and jury each decid[ed] different issues" at trial.  (*Ayyad, supra,* 210 Cal.App.4th at p. 855.)  Among other things, the trial court concluded the ETF's were unenforceable contractual penalties.  The jury determined plaintiffs had paid $73,775,975 in ETF's to Sprint and the trial court ruled plaintiffs were entitled to restitution in that amount.  (*Id.* at pp. 855-856.)  The jury also found plaintiffs had breached their contracts with Sprint and the early termination of those contracts had caused Sprint damages of $225,697,433.  (*Id.* at p. 856.)  The court determined plaintiffs were entitled to restitution of the collected ETF's, but also that this amount was subject to a setoff for Sprint's cross-claims.  (*Ibid.*)  After setting off plaintiffs' recovery against Sprint's damages on its cross-claims, Sprint's resulting net recovery was $151,921,458.  Pursuant to its earlier order that Sprint would not be permitted to collect money from plaintiffs, the court reduced Sprint's recovery to zero.  (*Ibid.*)

Following entry of judgment, the trial court granted plaintiffs' motion for a new trial and ordered a new trial on the amount of Sprint's actual damages on Sprint's cross-claims and on the court's calculation of the setoff.  (*Cellphone Termination Fee Cases, supra,* 193 Cal.App.4th at pp. 308-309.)  The court determined "'the jury did not follow the instructions to determine Sprint's actual total economic damages.'"  (*Id.* at p. 309.)  In a 2011 opinion, we affirmed and "remanded for retrial on the issue of Sprint's damages, and the calculation of any offset to which Sprint may be entitled."  (*Id.* at p. 330.)

*Expert Disclosures and the Court's May 2013 Pretrial Order*

Following remand, the court set a January 2012 trial date.  In November 2011, plaintiffs served a demand for exchange of expert witness information (§ 2034.210).  The court ordered the parties to "exchange initial and supplemental expert declarations and

3

reports" by November 30, 2011 pursuant to section 2034.260.[4]  The court later vacated the expert disclosure date and set: (1) a July 2013 trial date; (2) an April 26, 2013 deadline for expert disclosures and reports; and (3) a May 3, 2013 deadline for supplemental expert disclosures and reports.  The court's April 2013 order on expert discovery provided: "The law on the admissibility of expert testimony has changed since the first . . . trial . . . .  Therefore, the court will permit new expert disclosures and new expert depositions. . . . [¶] The Court orders the use of initial and supplemental expert declarations and reports that meet the requirement of both [section] 2034.260(c)" and Federal Rules of Civil Procedure, rule 26(a)(2)(B).

Sprint timely served its expert disclosure designating four expert witnesses: (1) Dr. William E. Taylor; (2) Jeffrey L. Baliban; (3) Dr. Christian Dippon; and (4) Dr. Seth Kaplan.  In their "Expert Witness Submission," made pursuant to section 2034.260, subdivision (b)(2), plaintiffs did "not designate any expert witnesses at this time. Plaintiffs reserve[d] the right to make a supplemental designation pursuant to . . . [s]ection 2034.280(a) of one or more experts to express opinions on subjects to be covered by experts designated by . . . Sprint."  At hearings and in pretrial pleadings in March and April 2013, however, plaintiffs referred to Dr. Selwyn as their expert witness and claimed he "will testify again, as he did in 2008, that damages [were] zero for Sprint" and that "Sprint suffer[ed] no compensable damages whatsoever from early termination."

In May 2013, the court determined Sprint could seek reliance damages for "the money it spent in reliance on the contracts" and lost profits damages for "'anticipated profits which [it] would have derived from performance.'"  As the court explained, breach of contract damages "can be measured by both (1) the plaintiffs 'reasonable outlay or expenditure toward performance' and (2) 'the anticipated profits which [it] would have derived from performance.' [Citations.]"  The court concluded Sprint's "'reasonable

---

[4]     On remand, Sprint moved to compel arbitration.  (*Ayyad, supra,* 210 Cal.App.4th at p. 854.)  The trial court refused to hear the motion and Sprint appealed, staying the case in the trial court.  In October 2012, we affirmed, concluding "the trial court properly refused to hear Sprint's motion, because doing so would have exceeded its jurisdiction on remand."  (*Ibid.*)

outlay or expenditure toward performance' would be measured by the amount that it expended in reliance on the contracts. . . ." The court declined to determine if Sprint's lost profits and reliance damages were "alternative or cumulative and if alternative, when Sprint must elect its measure of damages."

The parties later agreed to serve second initial expert disclosures by May 17, 2013 and supplemental expert disclosures by June 12, 2013. On May 17, 2013, Sprint served Dr. Taylor's report on reliance damages. Dr. Taylor provided two alternate calculations for reliance damages: (1) reliance damages based on commission costs and handset subsidies; and (2) reliance damages based on cost per gross addition (CPGA) of a new customer. Plaintiffs did not designate an expert on May 17, 2013. On June 12, 2013, plaintiffs served a "Supplemental Expert Witness Designation" designating Dr. Selwyn as a "rebuttal expert witness[.]" The designation attached Dr. Selwyn's 47-page report, where he: (1) rebutted Sprint's expert testimony on reliance damage calculations; (2) "adopt[ed]" his prior deposition testimony and his 2008 trial testimony; and (3) reduced Sprint's lost profits damages from $18,425,130 to $5,001,107. Later that month, Sprint deposed Dr. Selwyn.

*Sprint's Motion to Strike Plaintiffs' Expert Designation*

Sprint moved to strike plaintiffs' expert designation, arguing plaintiffs "missed" the April and May 2013 designation deadlines and — as a result — had "failed to designate an expert witness for the retrial." Sprint claimed plaintiffs violated section 2034.210 et seq., which requires a simultaneous exchange of information on expert trial witnesses. Over plaintiffs' objection, the court granted Sprint's motion and precluded plaintiffs from presenting "any expert testimony on what [plaintiffs] contend is the appropriate amount of Sprint's damages." The court explained "[f]rom March 3, 2011, to the present it has been clear that the re-trial would concern the amount of Sprint's damages. Therefore, it was incumbent on plaintiffs to identify any expert who they intended to present on the issue of Sprint's damages in their initial expert disclosure." The court determined section 2034.300 and *Fairfax v. Lords* (2006) 138 Cal.App.4th 1019 compelled the exclusion of plaintiffs' expert testimony on Sprint's damages.

5

Regarding prejudice, the court explained, "[p]laintiffs argue that Sprint suffered no prejudice because Sprint knew that plaintiffs intended to use Dr. Selwyn as an expert on damages and that Sprint had deposed Dr. Selwyn repeatedly before the first trial and cross-examined him in the first trial. This is not persuasive. Sprint has suffered prejudice because it disclosed its experts and their reports before the Sprint experts had the opportunity to review any new report that Dr. Selwyn might prepare. Plaintiffs, in contrast, held off on disclosing Dr. Selwyn's report until after [he] reviewed the reports of Sprint's experts." Additionally, the court noted the "prejudice to the orderly administration of the pre-trial process" because section 2034.010 and the court's April 2013 order required "a simultaneous rather than a staggered exchange of initial expert disclosures and information." The court, however, allowed Dr. Selwyn to provide testimony to impeach Dr. Taylor's opinions on Sprint's damages (§ 2034.310, subd. (b)).

The court denied plaintiffs' ex parte motion to augment, amend, or submit a tardy expert witness designation, reiterating its conclusion that Sprint was prejudiced by the late disclosure and determining plaintiffs "made a conscious and willful decision not to make the simultaneous exchange of expert designations and reports as required by" the April 2013 order "in an effort to obtain some tactical advantage." This court denied plaintiffs' petition for writ relief. (*Ayyad v. Sprint Spectrum, L.P.* (July 16, 2013, A139223 [nonpub. order].)

*Sprint's Case on Retrial*

The only issue at retrial was the amount of Sprint's damages caused by plaintiffs' breaches of their Sprint contracts. Sprint sought damages on two alternate theories: (1) lost profits — the amounts remaining on the contracts plaintiffs breached; and (2) reliance damages — outlays Sprint made in reliance on plaintiffs' promises to remain customers throughout the duration of their contracts.

A. Lost Profits Damages

Sprint argued it suffered $1,059,373,735 in lost profits. Dr. Taylor testified the formula for lost profits is lost revenue — the revenue Sprint would have received from class members had they had not breached their contracts — minus avoided costs — costs

6

Sprint no longer incurred after class members were not part of the Sprint network. Dr. Taylor testified Sprint lost $1,293,970,606 in revenue when class members terminated their contracts early. He calculated this figure by multiplying the average monthly reoccurring charge in the class members' contracts ($49.16) by the average number of months remaining on the class members' contracts (13.25 months) by the total number of class members (1,986,537).

Next, Dr. Taylor calculated Sprint's avoided costs using the "avoided cost percentage" calculated by Jeffrey Baliban — the "ratio of the actual costs" Sprint would avoid, divided by the average monthly recurring charge in class members' contracts — of 18.13 percent. Dr. Taylor subtracted the avoided costs of $234,596,871 from lost revenue and determined Sprint's lost profits were $1,059,373,735.

B. Reliance Damages

Sprint argued it suffered reliance damages. Sprint claimed it expended $79,431,915 in commission reliance damages, and $265,350,992 handset subsidy reliance damages, or $772,405,316 CPGA reliance damages. Jay Franklin, Sprint's Director of Accounting, testified Sprint paid commissions to Sprint employees and to third party retailers (such as Best Buy or RadioShack) when a customer entered into a new "term agreement" or when an existing Sprint customer upgraded an existing term agreement. William Souder, Sprint's Senior Vice President of Pricing, provided similar testimony. To support its commission damages, Sprint relied on a document summarizing its commission expenses and providing a weighted average for commission payments made by Sprint from 2003 to 2007. Franklin determined the weighted average for Sprint's commission payments was $41.69. Dr. Taylor multiplied that number with the number of class members with confirmed contracts and determined Sprint's total commission outlay was $79,431,915.

Sprint argued it suffered $265,350,992 in handset subsidy reliance damages — i.e., the difference between what Sprint paid to the phone manufacturer for a new phone and what plaintiffs actually paid for the phone. Using data provided by Rebecca Findlay, Sprint's Supervisor of Accounts Payable, Dr. Taylor determined Sprint's average

7

weighted handset cost was $179.28. Using data provided by Dr. Dippon, Dr. Taylor then determined class members paid an average of $40.01 for their handsets. Subtracting $40.01 from the range of handset costs, Dr. Taylor determined Sprint paid an average handset subsidy between $139 and $154 to each class member.[5] Finally, Dr. Taylor multiplied $139, the lower end of the subsidy range, to the number of class members and concluded Sprint expended $265,350,992 on handset subsidies.

In the alternative, Sprint argued it suffered $772,405,316 CPGA reliance damages — the cost Sprint incurred in subscribing a new customer to its network. Souder testified there are three categories of CPGA: (1) handset subsidies; (2) commissions; and (3) advertising and marketing. Dr. Taylor testified the average weighted CPGA during the class period was $388.82 and multiplied this number by the number of class members, for a total CPGA of $772,405,316.

*Plaintiffs' Reconsideration Motion*

Near the end of Sprint's case-in-chief, plaintiffs moved for reconsideration of the order striking their expert designation and precluding Dr. Selwyn from testifying on Sprint's damages. Plaintiffs argued the court erred by concluding section 2034.300 "'compelled'" it to exclude Dr. Selwyn's testimony and claimed Sprint had not been prejudiced by the untimely expert designation. Plaintiffs also urged the court to allow them to read Dr. Selwyn's 2008 trial testimony into the record: they claimed doing so would not prejudice Sprint because Dr. Selwyn's "testimony ha[d] already been given, and Sprint conducted a full cross-examination[.]"

Sprint opposed the motion. Among other things, it argued section 2034.300 precluded plaintiffs from offering Dr. Selwyn's 2008 trial testimony and the testimony was inadmissible hearsay. Additionally, Sprint claimed it would be prejudiced if plaintiffs read Dr. Selwyn's 2008 trial testimony into the record because it would "be unable to cross-examine Dr. Selwyn regarding his change of damages figures" and because Sprint had presented its case "under the impression that Dr. Selwyn cannot

---

[5]     Two other Sprint witnesses testified the average handset subsidy during the relevant time period was $150.

8

present any expert opinion in this trial. If this Court permits Plaintiffs to . . . introduce Dr. Selwyn's testimony through the back door, it will force Sprint to attempt to relearn opinions offered . . . nearly six years ago, and on subjects having nothing to do with the remaining issues in this case."

Following a hearing, the court partially granted the motion and permitted plaintiffs to read Dr. Selwyn's 2008 trial testimony into the record. The court concluded this "lesser sanction" was "more appropriate than the exclusion of all expert testimony by Dr. Selwyn." It acknowledged its ruling would "cause some prejudice to Sprint. This is a change made mid-trial, but Sprint has not demonstrated that its presentation of its own case was materially different because it relied on Dr. Selwyn not testifying. Sprint will be permitted to cross-examine Dr. Selwyn, but that cross-examination will necessarily be limited to the cross-examination on the transcript of the 2008 trial. In the 2008 trial Sprint was represented by competent counsel and had the same incentive to defend itself as it has in this retrial. To the extent that Dr. Selwyn's prior trial testimony presents new issues on damages that Dr. Taylor did not address, then Sprint may call Dr. Taylor for redirect. Finally, Sprint's counsel will not need to prepare for live cross-examination and will instead need to go through the 2008 transcript and make objections and designations for completeness just as if a deposition were offered into evidence."[6] The court declined to permit Sprint to introduce video clips of its 2008 cross-examination of Dr. Selwyn when it cross-examined him, but allowed Sprint to use the clips during its rebuttal.

*Dr. Selwyn's Testimony*

Plaintiffs' counsel read portions of Dr. Selwyn's 2008 trial testimony into the record at trial. Dr. Selwyn analyzed Sprint's business and conducted a "cost analysis" to determine "the financial consequences for Sprint resulting from early terminations." Dr. Selwyn determined Sprint suffered $1,054,066,606 in lost revenue, a calculation somewhat similar to Dr. Taylor's. Dr. Selwyn concluded, however, Sprint's avoided cost

---

[6]     The court admitted Dr. Selwyn's 2008 trial testimony notwithstanding its conclusion that the testimony did not come within the prior testimony exception to the hearsay rule (Evid. Code, §§ 240, 1291, 1292).

percentage was 98.5 percent, not 18.13 percent as calculated by Baliban. Dr. Selwyn criticized Baliban's method of determining the avoided cost percentage. Dr. Selwyn testified Sprint's lost profits were $18,425,130. To reach this number, Dr. Selwyn multiplied the average months remaining on plaintiffs' contracts (13.25) and Sprint's avoided cost (.70) for a total of $9.27. Dr. Selwyn multiplied $9.27 by the number of class members (1,986,537).

*Verdict and Sprint's Post-Trial Motions*

Plaintiffs moved for a directed verdict on Sprint's lost profits claim. Sprint also moved for a directed verdict. The court denied the motions. After one day of deliberations, the jury returned a special verdict awarding Sprint $18,425,130 in lost profits and $0 in reliance damages. The court set off Sprint's recovery of $18,425,130 against plaintiffs' recovery of $73,775,975 (from the first trial) and determined plaintiffs' "resulting net recovery will be $55,350,845."

A. Sprint's JNOV Motion

Sprint moved for JNOV, contending the evidence was insufficient as a matter of law to support the verdict. Sprint argued it "provided ample uncontroverted evidence in support of both its reliance and lost profits damage claims and was entitled to a directed verdict in excess of $300 million. The jury's verdict finding that Sprint suffered zero reliance damages simply cannot be supported by evidence, law or logic. Similarly, the jury's verdict awarding Dr. Selwyn's lost profits damages number cannot stand because the jury acted arbitrarily in rejecting the entire testimonies of Doug Smith, Jeffrey Baliban and Dr. Taylor to reach this result and because Dr. Selwyn's testimony should never have been before this jury for consideration."

In opposition, plaintiffs claimed the court had no power to grant JNOV because the sole issue at trial was the amount of Sprint's unliquidated damages, and "[u]nder California law, a trial court has 'no power to grant JNOV as to unliquidated damages.'" Plaintiffs also argued substantial evidence supported the jury's verdict because: (1) Sprint conceded the parties presented conflicting testimony regarding Sprint's lost profits; (2) Dr. Selwyn's testimony was "substantial evidence supporting the jury's verdict on lost

10

profits. Indeed, the jury's verdict on lost profits, $18,425,130, was the exact amount calculated by Dr. Selwyn. . . . Under the applicable legal standard, Dr. Selwyn's testimony is presumed true, and is viewed in the light most favorable to the Class. . . . Given the conflict between Dr. Taylor's and Dr. Selwyn's calculations of lost profits, JNOV clearly must be denied with respect to lost profits[;]" (3) the lost profits verdict mooted reliance damages; and (4) substantial evidence supported the jury's award of $0 reliance damages.

In reply, Sprint argued the uncontroverted evidence established it suffered reliance damages which "exceed[ed] and completely offset [p]laintiffs' claims." According to Sprint, the jury's conclusion Sprint suffered no reliance damages "when it subsidized nearly 2 million handsets for class members who breached their contracts with two thirds remaining on the terms . . . cannot be reconciled with law, logic or common sense." Sprint also claimed the court erred by admitting Dr. Selwyn's testimony and without it, Sprint was entitled to judgment "in the amount testified to by Sprint's experts."

B. Sprint's New Trial Motion

Sprint moved for a new trial on 10 grounds (§ 657, subds. (1), (3), (5), (6), (7)).[7] Sprint claimed it was entitled to a new trial pursuant to section 657, subdivisions (1), (3), and (7) because the court's order allowing plaintiffs to read Dr. Selwyn's 2008 trial testimony "at the end of Sprint's case" was a "'legal error'" and a "'surprise' and an irregularity in the proceeding" that deprived Sprint of a fair trial. Sprint claimed: (1) the court was required to exclude Dr. Selwyn's 2008 trial testimony pursuant to section 2034.300; (2) the court's decision to admit the testimony violated section 2034.310; (3)

---

[7]     Section 657 states in relevant part: "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] 1. Irregularity in the proceedings . . . or any order of the court or abuse of discretion by which either party was prevented from having a fair trial . . . [¶] 3. Accident or surprise . . . [¶] 5. Excessive or inadequate damages[;] [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law[;] [¶] 7. Error in law, occurring at the trial and excepted to by the party making the application."

11

Dr. Selwyn's trial testimony was inadmissible hearsay; and (4) it was prejudiced by the admission of the testimony.

Sprint also argued it was entitled to a new trial on reliance damages because "the jury's award of $0 in reliance damages was 'inadequate'" and "indefensible" in light of "Sprint's uncontroverted evidence indicat[ing] that it at least suffered $79 million in commissions expended, $265 million in handset subsidies, and $772 million in total CPGA." Sprint claimed a new trial based on "'inadequate'" damages was warranted because the uncontroverted evidence supported an award of reliance damages. (§ 657, subds. (5), (6).)

Finally, Sprint argued plaintiffs' counsel's misconduct constituted an "irregularity in the proceedings and legal error" (§ 657, subds. (1), (7)). According to Sprint, plaintiffs' counsel: (1) misled the jury by suggesting Sprint initiated the lawsuit to seek affirmative relief from the class; (2) misstated the law on damages; and (3) attempted "to prove Sprint's damages through incompetent individualized evidence" in violation of a court order. Sprint claimed the court compounded these problems by precluding Sprint from "rebutting these assertions with class-wide data." Finally, Sprint argued certain jury instructions were legally erroneous (§ 657, subd. (7)).

In opposition, plaintiffs argued sufficient credible evidence supported the jury's verdict on reliance damages. They also contended the court did not err by admitting Dr. Selwyn's 2008 trial testimony, its admission was not a surprise or an irregularity in the proceedings under section 657, subdivisions (1) and (3), and Sprint was not prejudiced by its admission. Additionally, plaintiffs claimed Sprint was not prejudiced by any alleged misconduct by plaintiffs' counsel, or by the jury instructions. In reply, Sprint argued it was deprived of a fair trial by the erroneous admission of Dr. Selwyn's testimony, counsel for plaintiffs' misconduct, and the improper jury instructions.

C. The Court's Order

Following a lengthy hearing, the court denied Sprint's JNOV motion. In a comprehensive written order, the court determined Sprint's damages for breach of contract were "not liquidated and were the subject of conflicting testimony. . . . [¶] As a

12

matter of law, the court cannot enter JNOV on Sprint's unliquidated contract damages. The court may grant JNOV 'only when it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence and that any other holding would be so lacking in evidentiary support.' (*Spillman v. City Etc. of San Francisco* (1967) 252 Cal.App.2d 782, 786 [(*Spillman*)]." The court observed it could not determine the amount of Sprint's "unliquidated damages" on JNOV because the "'rules of law governing the recovery of damages for breach of contract are very flexible.' . . . Even if the court were to determine that the evidence did not support the award of $18,425,130 as Sprint's lost profits damages, the court could not state that some amount of damages was correct as a matter of law and that no other reasonable conclusion was legally deducible."

The court denied Sprint's motion for new trial on reliance damages. In doing so, the court rejected Sprint's claim that evidence of its reliance damages was insufficient to justify an award of $0, observing the "jury could reasonably have decided to limit recoverable expenditures to those that Sprint incurred after contract formation." As the court explained, Sprint presented evidence it expended $79 million on commissions, but the jury "could have reasonably found that Sprint incurred the commissions as part of contract acquisition, not in reliance on an executed contract. [¶] Sprint presented evidence that it subsidized most handsets by approximately $150 each and expended $265 million on handset subsidies. The jury could have reasonably [found] that Sprint purchased the handsets in anticipation of contract formation, not in reliance on executed contracts. The jury could have reasonably found that Sprint's sale of handsets at below its cost or below the retail market price was a cost that Sprint incurred to induce contract formation, not in reliance on executed contracts." Finally, the court observed Sprint's CPGA was "$772 [million] for the . . . class. . . . The jury could have reasonably found that Sprint's CPGA figure is an unreliable indicator of reliance damages because it includes marketing and advertising, which are not related to contract performance, handset subsidies, which are incurred as inducements to contract formation, and . . . commissions, which are incurred for contract acquisition. [¶] Based on the above, the court finds that the evidence was

13

sufficient to justify the jury's award of $0 in reliance damages on the jury instruction given."

The court granted Sprint's motion for new trial on lost profits, revisiting the issue of the admissibility of Dr. Selwyn's testimony. It adopted its analysis from the order striking plaintiffs' expert designation, and concluded the erroneous admission of Dr. Selwyn's testimony constituted an error of law (§ 657, subd. (7)). The court determined it was required to exclude Dr. Selwyn's testimony because plaintiffs' expert designation was untimely (§§ 2034.260, 2034.300). The court also concluded the error was prejudicial because "Sprint was unable to cross-examine Dr. Selwyn on the changes in his testimony between 2008 and 2013 and the jury was unable to evaluate Dr. Selwyn's demeanor on the witness stand." In addition, the court concluded the admission of Dr. Selwyn's testimony warranted a new trial on the grounds of irregularity in the proceedings and surprise (§ 657, subds. (1), (3)) because "[t]he proceedings were irregular in that Sprint was unable to cross-examine Dr. Selwyn on the changes in his testimony between 2008 and 2013 and the jury was unable to evaluate Dr. Selwyn's demeanor. The reading of Dr. Selwyn's testimony was a surprise in that the court issued its order at the close of Sprint's opening and Sprint had to present testimony in reply that Sprint would have preferred to present in its opening had it known that Dr. Selwyn would testify."

The court rejected Sprint's motion for new trial on the grounds of erroneous jury instructions and counsel for plaintiffs' alleged misconduct.

## DISCUSSION

### I.

### *We Decline to Consider Plaintiffs' Challenge to the Denial of Their Directed Verdict Motion*

Plaintiffs appeal from the order denying their directed verdict motion. Sprint moved to dismiss this portion of plaintiffs' appeal, contending the directed verdict order was "neither appealable nor reviewable" under sections 904.1 or 906. We deferred the

14

ruling on the motion. As we explain below, we now grant the motion and dismiss plaintiffs' appeal from the denial of their directed verdict motion.

The order denying plaintiffs' directed verdict motion is not appealable under section 904.1. (See *Montijo v. Western Greyhound Lines* (1963) 219 Cal.App.2d 342, 350; Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2014) ¶ 2:258, p. 2-146.) Nor is the order reviewable under section 906, cited by plaintiffs as the basis for appellate jurisdiction. "Pursuant to section 906, a nonappealable intermediate order that 'substantially affects the rights of a party' may be reviewed in conjunction with an appeal of a final judgment or appealable order. The clear import of that provision is to allow an appellate court to review rulings, orders, or other decisions that led up to, or directly related to, the judgment or order being appealed to the extent they substantially affected the rights of one of the parties to the appeal. It is implicit within section 906's language that the 'intermediate' order or decision that substantially affects the rights of a party must be one that led up to, or directly relates to, the judgment or order being appealed." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 948 (*Cahill*).)

Here, the order denying plaintiffs' directed verdict motion does not involve the merits of, necessarily affect, or directly relate to the order partially granting Sprint's new trial motion. Plaintiffs' arguments to the contrary are unpersuasive. At most, plaintiffs' directed verdict motion was "substantively and/or procedurally collateral to, and not directly related to, the . . . [¶] . . . order being appealed." (*Cahill, supra,* 194 Cal.App.4th at p. 948.) As a result, the order denying plaintiffs' motion for directed verdict is not reviewable under section 906. "The existence of an appealable order or judgment is a jurisdictional prerequisite to an appeal." (*Canandaigua Wine Co., Inc. v. County of Madera* (2009) 177 Cal.App.4th 298, 302 (*Madera*).) Because the directed verdict order is not appealable under sections 904.1 or 906, we must dismiss plaintiffs' appeal from that order. (*Madera*, *supra*, at p. 302.)

We decline to consider plaintiffs' challenge to the denial of their directed verdict motion for the additional reason they failed to "cite us to any portion of the voluminous

15

record" where they moved for directed verdict or where they argued in the trial court "the recovery of lost future profits was barred by Civil Code [section] 3300" and *Postal Instant Press, Inc. v. Sealy* (1996) 43 Cal.App.4th 1704. (*Dincau v. Tamayose* (1982) 131 Cal.App.3d 780, 794.) "[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287.) "The larger and more complex the record, the more important it is for the litigants to adhere to appellate rules." (*Id.* at p. 287.) It is not enough for plaintiffs to identify the date where they moved for directed verdict, because the reporter's transcript of the hearing on that date is over 250 pages. Plaintiffs have waived any challenge to the denial of their directed verdict motion by failing to cite to a place in the record where they moved for directed verdict or asserted the argument they raise here. (*Ibid.*)

II.

*The Court Properly Denied Sprint's JNOV Motion*

Sprint challenges the denial of its JNOV motion, claiming the court "committed legal error" by concluding it could not, as a matter of law, "enter JNOV on Sprint's unliquidated contract damages." Sprint also claims it was entitled to JNOV because evidence of its damages was uncontroverted. "The denial of a motion for judgment notwithstanding the verdict is reviewed for substantial evidence to support the verdict. [Citation.] If the ruling involves a purely legal question, however, it is reviewed de novo. [Citation.]" (*Sanchez v. Brooke* (2012) 204 Cal.App.4th 126, 134-135.)

A. The Court Did Not Make a "Legal Error" by Denying Sprint's JNOV Motion

On appeal, Sprint contends the court's conclusion that it was "legally barred from granting Sprint JNOV because its damages were purportedly 'unliquidated'" was a "legal error." Sprint's focus on the word "unliquidated" in the court's order is myopic. A careful reading of the court's order demonstrates the court denied Sprint's JNOV motion because the evidence of Sprint's damages was conflicting. As stated above, the court

16

denied the JNOV motion because Sprint's damages on its breach of contract claim were "not liquidated and were the *subject of conflicting testimony*." Citing *Spillman, supra,* 252 Cal.App.2d 782, the court explained it could "grant JNOV 'only when it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence and that any other holding would be so lacking in evidentiary support.' [Citation.]" The court observed it could not determine the amount of Sprint's "unliquidated damages" on JNOV because the "'rules of law governing the recovery of damages for breach of contract are very flexible.' . . . Even if the court were to determine that the evidence did not support the award of $18,425,130 as Sprint's lost profits damages, the court *could not state that some amount of damages was correct as a matter of law and that no other reasonable conclusion was legally deducible*."[8] (Italics added.)

The court's reliance on *Spillman* supports the conclusion that the court denied the JNOV motion not because Sprint's damages were "unliquidated" but because the court could not conclude only one amount of damages was correct as a matter of law. In *Spillman*, the plaintiff sued the City and County of San Francisco and one of its employees (collectively, City) after a City employee hit her with a City-owned car. (*Spillman, supra,* 252 Cal.App.2d at p. 783.) At trial, plaintiff offered evidence regarding the accident and her injuries, but the City was "successful in impeaching [her] credibility in a variety of ways" and offered an expert witness who provided evidence disputing the extent of the plaintiff's injuries. (*Id.* at p. 785.) A jury returned a verdict for the plaintiff on liability and for the City on damages. (*Id.* at p. 786.) The court then granted plaintiff's JNOV motion and ordered judgment for plaintiff for $10,000. (*Ibid.*)

---

[8] The court's reference to JNOV being improper where damages are "unliquidated" may have come from a practice guide stating a trial court has "[n]o power to grant JNOV as to unliquidated damages" and explaining: "[w]here damages are unliquidated (e.g., personal injury, pain and suffering), the judge may *not* grant a plaintiff's JNOV motion on liability *and also* assess damages in a particular amount. Doing so deprives defendant of its right to jury trial on damages issues." (Wegner, et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2014) ¶ 18:17, pp. 18-4-18-5 (Rutter), citing *Spillman, supra,* 252 Cal.App.2d at p. 786.)

17

The City appealed, and a division of this court reversed, explaining "judgment notwithstanding the verdict may be sustained only when it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence and that any other holding would be so lacking in evidentiary support that the reviewing court would be compelled to reverse it or the trial court would be required to set it aside as a matter of law. [Citation.] The court is not authorized to determine the weight of the evidence or the credibility of witnesses. [Citation.] Even though a court might be justified in granting a new trial, it would not be justified in directing a verdict or granting judgment notwithstanding the verdict on the same evidence. [Citation.]" (*Spillman, supra,* 252 Cal.App.2d at p. 786.)

The *Spillman* court concluded "there was considerable conflict in the evidence as to the amount of damages sustained by plaintiff, and that since her credibility was seriously impeached, the jury was entitled to disregard much of her testimony. Under such circumstances, . . . the court clearly abused its discretion in granting judgment notwithstanding the verdict and . . . usurped [the City's] right to a trial by jury when it took upon itself to reweigh the evidence and, despite the conflicts therein, to fix plaintiff's damages at $10,000." (*Spillman, supra,* 252 Cal.App.2d at pp. 786-787.) The court explained that "the fact that the jury would have been justified in rendering a verdict in the amount of $10,000 clearly does not mean that the court was correct in granting judgment notwithstanding the verdict in that amount. A verdict in a substantially lower amount would also have been entirely in accord with the evidence." (*Id.* at p. 787.)

We reject Sprint's claim that the court "committed legal error" when it denied Sprint's JNOV motion. The court based its ruling on the well-established principle articulated in *Spillman* that JNOV is inappropriate where there is conflicting evidence on damages. (*Spillman, supra,* 252 Cal.App.2d at pp. 786-787; *Hozz v. Felder* (1959) 167 Cal.App.2d 197, 200 [court could not grant JNOV where "the jury could have returned various verdicts, all supported by substantial evidence"].)

18

B.  Sprint Was Not Entitled to JNOV on Lost Profits Damages

Sprint contends the court erred by failing to grant JNOV on its claim for lost profits damages because it offered evidence it suffered $1.059 billion in lost profits, and this figure "would have remained completely uncontroverted at trial" but for the court's error in admitting Dr. Selwyn's 2008 trial testimony.  The problem with this argument is "[e]ven evidence improperly admitted during trial constitutes 'substantial evidence' on a JNOV motion. . . . The proper remedy to review erroneous evidentiary rulings is a motion for new trial or appeal."  (Rutter, *supra,* ¶ 18:57, p. 18-13; *Donahue v. Ziv Television Programs, Inc.* (1966) 245 Cal.App.2d 593.)  As we discuss *infra*, the "proper remedy" for the erroneous admission of Dr. Selwyn's testimony, "would be a new trial" on lost profits, which Sprint "will, of course, have."  (*Id*. at p. 610.)

C.  Sprint Was Not Entitled to JNOV on Reliance Damages

According to Sprint, the court erred by denying its motion for JNOV on reliance damages because the evidence supporting that measure of damages was "completely uncontroverted at trial" and because "[t]here was no evidence supporting the jury's $0 reliance verdict[.]"

Reliance damages are an alternative measure of damages for breach of contract. (1 Witkin, Contracts (10th ed. 2005) § 883, p. 970 (Witkin); *US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 907; see also *Agam v. Gavra* (2015) 236 Cal.App.4th 91 [defining reliance damages].)  Reliance damages are "frequently sought or awarded where, because of uncertainty or difficulty of proof or other reason, the plaintiff is unable to establish a claim for lost profits."  (Witkin, *supra,* § 883, at p. 970.)  As one commentator has explained, "a party that fails to meet the burden of proving prospective profits is not necessarily relegated to nominal damages.  The requirement of certainty also applies to damages based on reliance.  But a party that has relied on a contract can usually meet the burden of proving with sufficient certainty the extent of that reliance, even if unable to meet that burden as to profits.  The injured party can then recover damages for total breach based on reliance. . . ."  (III Farnsworth on Contracts (3d ed. 2004) § 12:16, pp. 279-280 (Farnsworth).)

19

"Reliance damages are used 'to put the non-breaching party in "as good a position as [it] would have been in had the contract not been made."'" [Citation.]" (*American Capital Corp. v. F.D.I.C.* (Fed. Cir. 2006) 472 F.3d 859, 867; *Glendale Federal Bank, FSB v. U.S.* (Fed. Cir. 2001) 239 F.3d 1374, 1383.) Reliance damages are typically defined as the "the amount of the plaintiff's expenditures, together with the reasonable value of his or her own services, in preparation and performance in reliance on the contract." (Witkin, *supra,* § 883, p. 970.) Reliance damages do not include "costs incurred *before* the contract was made." (Farnsworth, *supra,* § 12:16, p. 280, fn. omitted.) "[B]ecause reliance damages seek to measure the injured party's 'cost of reliance' on the breached contract, 'an injured party cannot recover for costs incurred *before* that party made the contract.'" (*DPJ Co. Ltd. Partnership v. F.D.I.C.* (1st Cir. 1994) 30 F.3d 247, 250 (*DPJ*), quoting Farnsworth on Contracts (2d ed. 1990) § 12.16, p. 928, n. 2.)

Relying on *Buxbom v. Smith* (1944) 23 Cal.2d 535 (*Buxbom*), Sprint contends reliance damages include expenses incurred before the contract is formed. *Buxbom* was an action for breach of contract to publish and distribute a newspaper. (*Id.* at p. 538.) Our high court defined reliance damages as: "'Where, without fault on his part, one party to a contract who is willing to perform it is prevented from doing so by the other party, the primary measure of damages is the amount of his loss, which may consist of his reasonable outlay or expenditure toward performance, and the anticipated profits which he would have derived from performance.' [Citations.]" (*Id.* at p. 541.) The court held the plaintiff could not recover reliance damages because he did "not seek to show with any degree of monetary certainty . . . some *reasonable outlay or expenditure in anticipation of performance*[.]" (*Id.* at pp. 541-542.)

*Buxbom* does not assist Sprint, because it did not hold reliance damages include expenses incurred prior to contract formation. *Buxbom* held a "party to a contract" may recover reliance damages when he or she is willing to perform, but is prevented from doing so by the "other party" to the contract. (*Buxbom, supra,* 23 Cal.2d at p. 541.) *Buxbom* refers to outlays or expenditures made in "anticipation of performance[,]" of the

20

contract, not anticipation of making the contract. (*Id.* at p. 542, italics omitted.) Under *Buxbom*, reliance damages are limited to expenses incurred after the parties enter into a contract.[9]

Sprint's reliance on the Restatement Second of Contracts section 349 (Restatement section 349) is similarly unavailing. Restatement section 349 provides: "As an alternative to the measure of damages . . . the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." (Rest.2d Contracts, § 349.) Nothing in Restatement section 349 suggests reliance damages include expenditures made before a contract is entered.

Sprint repeatedly contends it was entitled to JNOV on its claim for reliance damages because the evidence was "uncontroverted" and because plaintiffs did not offer "any evidence to contradict" Sprint's evidence of reliance damages. There are two problems with this argument. First, it ignores the rule that reliance damages do not include "costs incurred *before* the contract was made (see Farnsworth, *supra,* § 12:16, p. 280.) At trial, there was evidence suggesting some of the costs Sprint claimed as reliance damages were incurred prior to contract formation. For example, on cross-examination, Dr. Taylor listed the categories of CPGA — handset subsidy, expenses associated with selling, marketing, customer care, product development, and general administrative functions — and stated, "'these costs are incurred before the customer is acquired.'" When asked whether this statement was accurate, Dr. Taylor clarified, "Equal to or

---

9      Cases from other jurisdictions have reached a similar conclusion. (*Hollywood Fantasy Corp. v. Gabor* (5th Cir. 1998) 151 F.3d 203, 214 & fn. 4 [the "general rule is that the nonbreaching party may only recover out-of-pocket expenses incurred after the contract was formed"]; *Drysdale v. Woerth* (E.D. Pa. 2001) 153 F.Supp.2d 678, 684 [expenses incurred prior to contract formation "were not made in reliance on any promise of the defendant nor were they made in performance of the contract promise"]; *Gruber v. S-M News Co.* (S.D.N.Y. 1954) 126 F.Supp. 442, 447 [plaintiff could not recover cost of plates for printing cards "since these had already been fabricated prior to making the contract with defendant"].)

before. I mean, if you look at handset subsidy, for example, that is incurred when the customer is acquired; similarly, the commission one, the commission is paid when the customer is acquired." Dr. Souder defined CPGA as "costs that are incurred to attract customers to Sprint" and that CPGA costs such as advertising and marketing are incurred before a customer enters into an agreement with Sprint. Dr. Souder testified handset subsidies and commissions are incurred when the customer "activates a phone and enters into an agreement" with Sprint. In light of this evidence, the jury could have reasonably concluded some or all of Sprint's costs were incurred prior to contract formation, rather than in reliance on executed contracts.

Second — and as demonstrated above — the evidence supporting Sprint's reliance damages was not "uncontroverted." Sprint's own experts provided equivocal testimony about when Sprint incurred certain costs, and there was evidence suggesting Sprint's calculations regarding handset subsidies were inaccurate, and the amounts Sprint paid for Samsung and Motorola handsets was lower than the prices shown on invoices. And as Sprint's counsel acknowledged during closing argument, "[t]here are a lot of facts and a lot of calculations and things that are in dispute[.]" Finally, assuming the evidence was — as Sprint contends — "uncontroverted[,]" the jury was free to reject it. "'[E]xpert testimony, like any other, may be rejected by the trier of fact, so long as the rejection is not arbitrary.' [Citation.] Thus, '[a]s a general rule, "[p]rovided the trier of fact does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted. [Citations.]" [Citation.] This rule is applied equally to expert witnesses.' [Citation.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632.)

Neither *Aetna Life & Casualty Co. v. City of Los Angeles* (1985) 170 Cal.App.3d 865 (*Aetna*) nor *Dickenson v. Samples* (1951) 104 Cal.App.2d 311 (*Dickenson*) demonstrate the court erred by denying Sprint's JNOV motion on reliance damages. *Aetna* was a condemnation action, where the trial court granted plaintiff property owners' motion for directed verdict on the amount of their damages. (*Aetna, supra,* 170 Cal.App.3d at p. 876.) The "[d]efendants offered no evidence on damages, relying instead upon cross-examination of plaintiffs' expert witness and of the homeowners to

22

convince the jury that plaintiffs' damages were less than requested." (*Ibid.*) *Aetna* is distinguishable. "[S]pecial evidentiary rules" apply in a condemnation action which prohibit the jury from disregarding evidence regarding the property's value and from rendering a verdict exceeding or falling below the limits established by the plaintiffs and their qualified expert witnesses. (*Id.* at p. 877.) This is not a condemnation action, and as a result, the jury was free to disregard Sprint's evidence and to conclude it did not suffer reliance damages. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890.)

*Dickenson* is also inapposite. In that case, which concerned rent due under a lease agreement, the jury declined to award the plaintiff damages. The appellate court reversed, noting the defendant admitted "the rent was to be one third of profits" and the uncontradicted evidence showed a profit "of $163" for the month at issue. (*Dickenson, supra,* 104 Cal.App.2d at p. 313.) The *Dickenson* court explained, "[e]vidence which is uncontradicted and not inherently improbable may not be disregarded by the trier of fact." (*Id.* at p. 314.) *Dickenson* has no application here because there was no such admission in this case, and the evidence was not simple, straightforward, or uncontradicted.

Sprint's own brief demonstrates why it would have been inappropriate for the court to grant Sprint's motion for JNOV on reliance damages. Sprint claims entry of JNOV was "require[d]" for $772,405,316 in CPGA reliance damages *or* for $79,461,915 in commissions and $265,350,992 in handset subsidies. Which of these different amounts was required by law Sprint does not tell us. As we have explained, the evidence supporting Sprint's reliance damages was "not uncontested, as [Sprint] represents on appeal. Having reviewed the transcript of the trial, and recognizing that it was the exclusive province of the jury to determine the weight and sufficiency of the evidence, we cannot find a basis for overturning the verdict. The trial court did not err in denying the motion for JNOV" on Sprint's reliance damages. (*Linear Technology Corp. v. Tokyo Electron, Ltd.* (2011) 200 Cal.App.4th 1527, 1534.)

23

III.

*The Court Did Not Err by Granting a New Trial on
Sprint's Lost Profits Damages*

As stated above, the court granted Sprint's new trial motion on Sprint's lost profits damages, concluding the admission of Dr. Selwyn's 2008 trial testimony was: (1) an "irregularity in the proceedings" that prevented Sprint from receiving a fair trial; (2) a "surprise that ordinary prudence could not have guarded against[;]" and (3) an "error[ ] of law" that prejudiced Sprint.

A.  Section 657 and Standards of Review

Section 657 authorizes the trial court to grant a new trial on seven statutorily specified grounds, including "[i]rregularity in the proceedings of the court, . . . or any order of the court or abuse of discretion by which either party was prevented from having a fair trial[;]" (2) "[a]ccident or surprise, which ordinary prudence could not have guarded against[;]" (3) "[e]xcessive or inadequate damages" or "[i]nsufficiency of the evidence to justify the verdict or other decision[;]" or (4) "[e]rror in law, occurring at the trial and excepted to by the party making the application."  (§ 657, subds. (1), (3), (5), (6), (7).)

We review the court's order granting a new trial under section 657, subdivisions (1), (3), (5), and (6) for abuse of discretion.  (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1122 [reviewing grant of new trial based on "[i]rregularity in the proceedings" for abuse of discretion]; *In re Adoption of Curtis* (1961) 195 Cal.App.2d 179, 184 ["granting . . . a motion for a new trial on the ground of surprise is largely a matter of discretion"]; *Dodson v. J. Pacific, Inc.* (2007) 154 Cal.App.4th 931 (*Dodson*) [reviewing denial of new trial motion on inadequacy of damages for abuse of discretion].)

B.  The Court Was Well Within its Discretion to Grant a New Trial Based on Irregularity in the Proceedings or Surprise Preventing Sprint From Receiving a Fair Trial

As we have explained, the court's initial pretrial ruling excluded Dr. Selwyn's testimony.  Near the end of Sprint's case-in-chief, however, the court issued a different

24

ruling permitting plaintiffs to read Dr. Selwyn's 2008 trial testimony into the record. The court concluded this "lesser sanction" was "more appropriate than the exclusion of all expert testimony by Dr. Se[lw]yn." The court subsequently granted Sprint's new trial, concluding — among other things — that the admission of Dr. Selwyn's testimony warranted a new trial on the grounds of irregularity in the proceedings and surprise (§ 657, subds. (1), (3)) because: (1) "Sprint was unable to cross-examine Dr. Selwyn on the changes in his testimony between 2008 and 2013 and the jury was unable to evaluate Dr. Selwyn's demeanor[;]" and (2) "[t]he reading of Dr. Selwyn's testimony was a surprise in that the court issued its order at the close of Sprint's opening and Sprint had to present testimony in reply that Sprint would have preferred to present in its opening had it known that Dr. Selwyn would testify."

Plaintiffs claim Sprint waived its right to a new trial for "irregularity in the proceedings" or "surprise" (§ 657, subds. (1), (3)) by failing to move for a continuance or mistrial. As a general rule, a party seeking a new trial based on accident or surprise (§ 657, subd. (3)) must seek relief at the *earliest opportunity* . . . which means the motion [for new trial] will be denied if the problem could have been cured by earlier motion for mistrial, request for continuance, . . . etc." (Haning, et al., Cal Practice Guide: Personal Injury (The Rutter Group 2014) § 10:18, p. 10-10.) Plaintiffs rely on *Kauffman v. De Mutiis* (1948) 31 Cal.2d 429 (*Kauffman*), where defense counsel knew a material witness would not testify at trial, and made a strategic decision not to move for a continuance, which demonstrated counsel "intended to speculate upon a favorable verdict." (*Id.* at p. 433.) This case is unlike *Kauffman*. There was no evidence Sprint made a strategic decision not to move for a mistrial or continuance, nor is there any evidence Sprint "intended to speculate upon a favorable verdict." (*Ibid.*) Sprint vigorously opposed plaintiffs' motion to admit Dr. Selwyn's testimony midway through trial, and seeking a mistrial or continuance "probably would have been futile[.]" (*Whitfield v. Debrincat* (1937) 18 Cal.App.2d 730, 737 [affirming grant of new trial notwithstanding moving party's failure to seek a continuance]; *City of Fresno v. Harrison* (1984) 154 Cal.App.3d 296, 301-302 (*Harrison*).) Here, it is reasonable to conclude Sprint "acted in good faith

25

in omitting to apply for relief at an earlier stage in the proceedings." (*Delmas v. Martin* (1870) 39 Cal. 555, 558; *Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 730.)

The court did not err by concluding the reversal of its previous order midway through trial was an "[i]rregularity in the proceedings" (§ 657, subd. (1)) and a "surprise" (§ 657, subd. (3)) preventing Sprint from receiving a fair trial. *Harrison*, *supra,* 154 Cal.App.3d 296 is instructive. There, the issue at trial was the amount of the defendant property owners' damages in an eminent domain action. (*Id.* at p. 298.) The plaintiff municipality failed to timely disclose its expert witness, but the trial court allowed the plaintiff's expert to testify at trial over the defendants' objection. (*Id.* at p. 299.) The plaintiff's expert testified the defendants' damages were $0, and the jury adopted this number and concluded the defendants suffered no damages. (*Id.* at p. 298.) The trial court granted the defendants' new trial motion, concluding an irregularity in the proceeding and accident or surprise prevented defendants from having a fair trial. *Harrison* affirmed and determined the "trial court could rightly find a denial of a fair trial resulted from the unexpected testimony of [the plaintiff's] expert." (*Id.* at pp. 300-301.) Here as in *Harrison*, the court admitted Dr. Selywn's expert testimony midway through trial, over Sprint's objection. And like the *Harrison* jury, this jury found Dr. Selwyn's testimony persuasive and adopted his lost profits damages figure. Under these circumstances, the trial court rightly concluded the admission of Dr. Selwyn's 2008 trial testimony was an "[i]rregularity in the proceedings" and a "surprise" which deprived Sprint of a fair trial. (*Ibid.*; § 657, subds. (1), (3).)

The court's decision on last day of Sprint's case-in-chief to allow plaintiffs to read Dr. Selwyn's 2008 trial testimony clearly prejudiced Sprint. Sprint relied on the court's initial ruling excluding Dr. Selwyn's testimony when it presented its case at trial: it did not address Dr. Selwyn's expert opinions in its case-in-chief and limited the testimony it presented on damages to expedite the trial presentation and scale back the issues before the jury. When the court changed its mind and allowed plaintiffs to read Dr. Selwyn's 2008 trial testimony into the record, Sprint's case-in-chief was nearly complete and

26

Sprint was unable to present additional witnesses and testimony to counter Dr. Selwyn's testimony, and had to present evidence on rebuttal. (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1117-1118 [plaintiff's conduct prejudiced the defense, "which did not have the ability to counter the testimony of the belatedly disclosed experts"].) Additionally, Sprint was precluded from effectively cross-examining Dr. Selwyn. (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1526 [erroneous admission of testimony deprived the defendant of the "opportunity to cross-examine"].) Plaintiffs offer a variety of arguments, none of which demonstrate the court erred by concluding Sprint was prejudiced.

According to plaintiffs, a court's reversal of a previous order midway through trial cannot "be an irregularity or a surprise upon which a new trial order can be based" because in limine motions are always "subject to revision during trial." The problem with this argument is the cases upon which plaintiffs rely do not support such a sweeping conclusion. *People v. Superior Court (Mitchell)* (2010) 184 Cal.App.4th 451 concerned whether writ review was appropriate when a trial court excluded prosecution evidence as a discovery sanction. In the portion of *Mitchell* upon which plaintiffs rely, the court rejected the real party in interest's argument that an in limine order did not prejudice the prosecution. (*Id.* at p. 460.) *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72 questioned whether the plaintiff was entitled to review of an in limine order on appeal, and *People v. Riva* (2003) 112 Cal.App.4th 981 (*Riva*) considered whether "pretrial rulings on the admissibility of evidence . . . should be reviewable by another judge following a mistrial[.]" (*Id.* at p. 992.) None of these cases stand for the proposition that a court's reversal of its previous order midway through trial cannot constitute an "[i]rregularity in the proceedings" (§ 657, subd. (1)) or a "surprise" (§ 657, subd. (3)) preventing a party from receiving a fair trial.

Nor does *Scott v. C.R. Bard, Inc.* (2014) 231 Cal.App.4th 763 (*Scott*) assist plaintiffs. There, the trial court initially excluded certain evidence pursuant to a motion in limine; during trial, the court reversed the ruling and admitted the evidence. (*Id.* at p. 771.) The appellate court upheld the ruling, concluding the defendant's opening

27

statement made the evidence relevant and the trial "court had made it clear to both parties when it made the in limine rulings that they were subject to change and [the defendant] was aware of this when it questioned the potential jurors." (*Id.* at p. 784.) *Scott* is completely distinguishable. Here, the court's initial ruling excluding plaintiffs' expert witnesses was not "tentative" and nothing in Sprint's opening statement or case-in-chief changed the relevance of Dr. Selwyn's testimony.

We conclude the court was well within its discretion to order a new trial on Sprint's lost profits damages on the grounds of "[i]rregularity in the proceedings of the court[,] " or "[a]ccident or surprise[,] " (§ 657, subds. (1), (3)). Having reached this result, we need not address the grant of new trial on the ground that the admission of Dr. Selwyn's testimony was an "[e]rror in law" (§ 657, subd. (7)) or Sprint's claim that Dr. Selwyn's testimony was hearsay and the court "committed legal error" by admitting it.[10]

IV.

*Sprint Was Not Entitled to a New Trial on Reliance Damages*

Sprint challenges the court's denial of its motion for new trial on reliance damages.

A. The Trial Court Properly Rejected Sprint's Arguments Regarding the Jury Instructions

In the trial court, Sprint claimed it was entitled to a new trial on reliance damages based on erroneous jury instructions (§ 657, subd. (7)). The court rejected this argument and determined the jury instructions on contract damages (Jury Instruction No. 24), reliance damages (Jury Instruction No. 26), and nominal damages (Jury Instruction No. 28) were correct, and that Jury Instruction No. 28 may have been "unnecessary," but "its inclusion did not prejudice Sprint" because the jury did not award nominal damages. We review de novo the court's denial of Sprint's new trial on reliance damages based on an

---

[10] Sprint urges us to preclude plaintiffs from offering any expert opinion testimony on retrial. We decline to do so. "Since we conclude that retrial will be required on remand, we express no opinion as to the propriety or necessity of discovery in any further proceedings." (*Morrical v. Rogers* (2013) 220 Cal.App.4th 438, 459, fn. 19.)

alleged error in law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860; § 657, subd. (7).)

On appeal, Sprint reprises its claim that Jury Instructions Nos. 24, 26, and 28 were "legally erroneous" and deprived it of a fair trial. As stated above, Jury Instruction No. 24, Introduction to Contract Damages, identified the damages Sprint was seeking and provided, among other things, "[a]ny damages awarded must be proven to be either: [¶] Damages which were likely to arise in the ordinary course of events from the breach of the contract; or [¶] Damages which the parties could have reasonably foreseen as the probable result of the breach." Sprint claims Jury Instruction No. 24 — the instruction providing an overview of contract damages — "should not have included a foreseeability requirement" because neither lost profits nor reliance damages "requires damages to be 'reasonably foreseen.'"

Sprint has not demonstrated the instruction was erroneous. The instruction, derived from CACI No. 350, correctly states the law. (See Civ. Code, § 3300; *Reese v. Wong* (2001) 93 Cal.App.4th 51, 61.) Sprint's reliance on a trio of cases does not demonstrate the instruction was erroneous. Nor has Sprint demonstrated prejudice. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*) [no reversal for instructional error in a civil case unless "'the error complained of has resulted in a miscarriage of justice'"].)

Sprint also claims Jury Instruction No. 26 was "legally erroneous because it suggested to the jury that damages incurred pre-contract formation were not recoverable" as reliance damages. Jury Instruction No. 26 defined reliance damages as "the amount that Sprint expended in reliance for preparation or performance on the contracts from the dates the contracts were entered into until the dates of breach." The jury instruction correctly states the law. As we have explained, reliance damages do not include "costs incurred *before* the contract was made." (Farnsworth, *supra,* § 12:16, p. 280, fn. omitted; see also *Buxbom, supra,* 23 Cal.2d at pp. 541-542; *DPJ, supra,* 30 F.3d at p. 250.)

Finally, Sprint argues Jury Instruction No. 28 on nominal damages was "unnecessary" because "there was no dispute" Sprint suffered damages of at least

$18,425,130 as a result of plaintiffs' breaches of contract. Sprint also claims it was prejudiced by the instruction because the jury relied on it "to award Sprint $0 in reliance damages." Jury Instruction No. 28 defined nominal damages and provided: "If you decide that . . . Sprint was not harmed by the class members' breach, you may award Sprint nominal damages, such as one dollar."

We reject Sprint's challenge to Jury Instruction No. 28 for several reasons. First, it is unsupported by authority. When an appellant "fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) Second, the jury instruction correctly states the law. (See Civ. Code, § 3360, CACI No. 360.) Third, and assuming the jury instruction was unnecessary, there is no evidence supporting prejudice, i.e. that the jury used the instruction as a justification to award Sprint $0 in reliance damages. (*Soule, supra,* 8 Cal.4th at p. 580.) "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Ibid.*) There is no such probability here. That the jury asked for the definition of "harm" in Jury Instruction No. 28 does not suggest the jury relied on that instruction to award Sprint $0 in reliance damages, or that the jury was confused by the instruction. (See *Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 746 [rejecting confusion argument].) The jury instruction was not specific to reliance damages, and the jury declined to award nominal damages. Instead it determined Sprint was "harmed" and awarded lost profits damages.

We conclude the court properly denied Sprint's motion for a new trial on reliance damages based on allegedly erroneous jury instructions. (*Soule, supra,* 8 Cal.4th at p. 583.)

B. The Court Properly Rejected Sprint's Arguments Regarding the Insufficiency of the Evidence to Support the Reliance Damages Verdict

Sprint argued it was entitled to a new trial because the evidence was insufficient to justify the jury's award of $0 in reliance damages (§ 657, subd. (6)). The court disagreed and explained the jury "could reasonably have decided to limit recoverable expenditures

30

to those that Sprint incurred after contract formation." According to the court, the jury could have determined: (1) Sprint expended $79 million on commissions "as part of contract acquisition, not in reliance on an executed contract[;]" (2) Sprint incurred $265 million in handset subsidies "in anticipation of contract formation, not in reliance on executed contracts[;]" and (3) Sprint's CPGA of $772 million was "an unreliable indicator of reliance damages" because it included "marketing and advertising, which are not related to contract performance, handset subsidies, which are incurred as inducements to contract formation, and [ ] commissions, which are incurred for contract acquisition."

Sprint contends it was entitled to a new trial on reliance damages because the "jury's $0 verdict was not supported by law or fact." "'The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. . . . As a result, all presumptions are in favor of the decision of the trial court [citation].'" (*Izell v. Union Carbide Corporation* (2014) 231 Cal.App.4th 962, 978; *Dodson, supra,* 154 Cal.App.4th 931.

As we have explained, reliance damages do not include expenses incurred before contract formation. (*Buxbom, supra,* 23 Cal.2d at p. 541; Farnsworth, *supra,* § 12:16, p. 280.) As the party claiming reliance damages, Sprint had the burden to prove it suffered damage and to "prove the elements thereof with reasonable certainty." (*Mendoyoma, Inc. v. County of Mendocino* (1970) 8 Cal.App.3d 873 (*Mendoyoma*).) As discussed above, the evidence supporting Sprint's reliance damages was equivocal and the jury could reasonably conclude some or all of Sprint's costs were incurred prior to contract formation, rather than on reliance on executed contracts. Under the circumstances, the court was well within its discretion to conclude Sprint did not satisfy its burden to prove it incurred certain costs in anticipation of performance of its contracts with class members. (*Mendoyoma, supra,* 8 Cal.App.3d at pp. 880-881.)

The cases upon which Sprint relies — beginning with *Smith v. Covell* (1980) 100 Cal.App.3d 947 (*Covell*) —do not demonstrate the court abused its discretion by denying Sprint's new trial motion on reliance damages. *Covell* and the other cases cited by Sprint concern the adequacy of a damages award failing to compensate the plaintiff for loss of

31

consortium or pain and suffering. (*Id*. at p. 956 [jury failed "to follow the court's instructions of law" when it declined to award loss of consortium damages "[i]n the face of uncontradicted evidence"]; *Dodson, supra,* 154 Cal.App.4th at pp. 937-938 [plaintiff established right to recover pain and suffering damages, and defendants' fault].) This case does not concern loss of consortium or pain and suffering. Moreover, there is no indication the jury failed to follow the court's reliance damage jury instruction, or that Sprint was entitled to reliance damages as a matter of law. We conclude the court's denial of Sprint's new trial motion on this basis was not an abuse of discretion.

C. Sprint Is Not Entitled to a New Trial Based on Alleged Attorney Misconduct

Finally, the court rejected Sprint's argument that plaintiffs' counsel committed misconduct constituting an "[i]rregularity in the proceedings" and warranting a new trial (§ 657, subd. (1).)) The court found some "[i]rregularity in the proceedings" because plaintiffs' counsel: (1) presented individualized evidence regarding two class members; (2) attacked Sprint for failing to consider individual evidence; (3) misrepresented the case's procedural posture to the jury; and (4) argued Sprint's evidence was deficient because Sprint did not "put its expert reports into evidence." The court, however, determined the irregularity was cured by "Sprint's objections and the court's resulting actions" and concluded: "[c]onsidering the alleged misconduct in the aggregate, the court is not persuaded that [plaintiffs'] counsel engaged in misconduct that deprived Sprint of a fair trial."

Sprint contends it is entitled to a new trial on "all" of its damages, "not just lost profits" because of plaintiffs' counsel's misconduct. "[T]he term 'misconduct' means serious errors by counsel that may result in rebuke by the court or an order granting mistrial[.]" (Rutter, *supra,* ¶ 6:42, p. 6-10.) "Attorney misconduct is a ground for a new trial." (*Rayii v. Garcia* (2013) 218 Cal.App.4th 1402, 1411 (*Rayii*), citing § 657, subd. (1).) "A claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished." (*Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 211 (*Dominguez*).) We consider the merits of Sprint's misconduct claims because plaintiffs do not contend Sprint waived

32

these claims by failing "to assign the conduct as misconduct and request an admonition." (*Id.* at p. 211.)

"[W]hen attorney misconduct is at issue, we must independently consider whether the misconduct resulted in prejudice. Prejudice exists if it is reasonably probable that the jury would have arrived at a verdict more favorable to the moving party in the absence of the irregularity or error." (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1249 (*Pope*); *Rayii, supra,* 218 Cal.App.4th at p. 1411.) To determine whether Sprint was prejudiced, we "must determine whether it is reasonably probable [Sprint] would have achieved a more favorable result in the absence of" any attorney misconduct. We examine "the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of [counsel's] argument[.]" (*Cassim v. Allstate Ins. Co. (*2004) 33 Cal.4th 780, 802 (*Cassim*).)

Sprint identifies eight instances of attorney misconduct. First, Sprint claims plaintiffs' counsel committed misconduct because the court sustained 50 of its objections to plaintiffs' counsel's questions. According to Sprint, the court sustained the "vast majority" of its objections because the questions "were irrelevant." We have reviewed the objections cited by Sprint. The "vast majority" of the objections were not, as Sprint contends, sustained on relevance grounds. We decline to conclude 50 sustained objections over 18 trial days constitutes attorney misconduct, particularly where Sprint cites no authority supporting such a conclusion. "This was a lengthy trial, aggressively litigated on both sides, with many witnesses and with frequent objections being made on both sides." (*Dominguez, supra,* 212 Cal.App.3d at p. 213.) While a "witness may not be examined on matters that are irrelevant to the issues in the case[,]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 775 (*Mayfield*))[11] plaintiffs' counsel did not "overstep[ ] the bounds of propriety and fairness which should characterize his conduct as an officer of the court[.]" (See *Bandoni v. Walston* (1947) 79 Cal.App.2d 178, 190, internal citations omitted; *Dominguez, supra,* 212 Cal.App.3d at p. 212 [counsel "may have been

---

[11]    Abrogated by *People v. Scott* (June 8, 2015, S064858) ___ P.3d ___ [2015 WL 3541280.]

33

aggressive and persistent, approaching close to the line between proper and improper conduct [but] he did not overstep that line"].)

Nor has Sprint shown prejudice. Our high court has observed that "generally a party is not prejudiced by a question to which an objection has been sustained." (*Mayfield, supra,* 14 Cal.4th at p. 755; *Hamm v. San Joaquin & Kings River Canal Co.* (1941) 44 Cal.App.2d 47, 56-57 [no prejudice where defense attorneys elicited evidence defendants did not have liability insurance]; cf. *McDonald v. Price* (1947) 80 Cal.App.2d 150, 151-152 [in wrongful death case, plaintiff prejudiced by irrelevant and inflammatory questions asked by defense counsel regarding plaintiff's purported criminal history].) That the jury declined to award Sprint reliance damages does not constitute prejudice. (*Dominguez, supra,* 212 Cal.App.3d at p. 214.)

Second, Sprint claims plaintiffs' counsel portrayed the lawsuit as "'good' versus 'evil'" in questioning prospective jurors during voir dire when the case actually concerned Sprint's damages and entitlement to an offset. Sprint complains counsel's appeal to the jury's passion and prejudice was exacerbated by the court's refusal to inform the jury Sprint was not seeking affirmative relief. We reject this claim because Sprint's counsel did not object when plaintiffs' counsel characterized the case as representing "'good' versus 'evil.'" (Evid. Code, § 353.) Sprint's claim fails for the additional reason Sprint has not demonstrated prejudice. While it is improper for counsel to appeal to the jury's "social or economic prejudices" (*Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 883), Sprint has not demonstrated how plaintiffs' counsel's brief references to "'good' versus 'evil'" during voir dire questioning of prospective jurors who were not seated on the jury somehow affected a verdict rendered by other seated jurors 23 days later, a verdict awarding Sprint over $18 million dollars in damages. (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 159 (*Garcia*) [attorney's appeal to jury's passions not inherently prejudicial].) The court instructed the jury not to let "bias, sympathy, prejudice or public opinion influence your verdict." "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions

34

imposed' [Citation.]" (*Cassim, supra,* 33 Cal.4th at pp. 803-804 [attorney misconduct was not prejudicial].)

Third, Sprint argues plaintiffs' counsel committed misconduct by suggesting Sprint was trying to collect money from class members, when its "damages case [was] defensive in nature." During voir dire, plaintiffs' counsel asked a prospective juror whether "people that breached those contracts should have to pay money to Sprint[.]" During closing argument, plaintiffs' counsel argued Sprint's counsel "talked about 2 million broken promises, and he said that he didn't want anyone to profit from those and people shouldn't be rewarded for breaking their promises. But [it is] Sprint, that violated the law. And I would submit to you that it's Sprint that should not benefit from its own violations of the law." Counsel also asked the jury, "when you have a party that's violated the law and they come in and want an award of a billion dollars in damages, where do you set the burden of proof[,]" which prompted counsel for Sprint to object that counsel's argument "violates the Court's rule."

Sprint's pursuit of damages may have been "defensive in nature," but it *was* seeking damages from the class to offset the $73,775,974 the first jury determined Sprint collected in unlawful ETF's. Plaintiffs' counsel's characterization of Sprint's "violations of the law" complied with the court's order allowing the parties to "inform the jury that in the first trial the court found that Sprint's ETFs were unlawful[.]" Assuming for the sake of argument these references constituted attorney misconduct, Sprint has not demonstrated prejudice. (*Garcia, supra,* 204 Cal.App.4th at p. 159.) Class counsel's "offending references" were a "miniscule part" of a lengthy trial and a "'mere fraction of counsel's overall closing argument'" — approximately 14 lines of a 93-page closing argument. (*Id.* at p. 161, quoting *Cassim, supra,* 33 Cal.4th at pp. 802-803.) The jury was not likely swayed by these fleeting "offending references" (*Garcia, supra,* 204 Cal.App.4th at p. 159) because Sprint's counsel repeatedly reminded the jury in his closing argument that Sprint was seeking an "offset" and Sprint's claims were "defensive in nature." Additionally, the court instructed the jury that counsel's statements and arguments were not evidence and to make a decision based on the evidence and the law.

35

Nothing in the record "convinces us against adhering to the presumption that the jury followed the instruction." (*Garcia, supra,* 204 Cal.App.4th at p. 162; *Pope, supra,* 229 Cal.App.4th at p. 1250 [no prejudice from attorney misconduct].)

Fourth, Sprint contends plaintiffs' counsel committed misconduct by using individualized testimony from the class representatives and by attacking Sprint's decision not to present individualized evidence of damages. We disagree. There was no misconduct, and no prejudice to Sprint. The court allowed plaintiffs to "present evidence relating to the circumstances of individual members of the class that is relevant to the issue of Sprint's aggregate damages against the class" and "evidence relating to the circumstances of individual members of the class suggesting that Sprint's evidence is inaccurate or inconsistent." And Sprint concedes plaintiffs "never actually argued to the jury that the two class members' . . . individualized evidence directly countered Sprint's aggregate evidence."

Fifth, Sprint claims plaintiffs' counsel committed misconduct by "repeatedly misrepresent[ing]" Sprint received discounts from handset manufacturers when there was no such evidence before the jury. We have reviewed the *two* instances cited by Sprint — which hardly rise to the level of repeated — and conclude Sprint's argument has no merit. Findlay admitted Sprint had an agreement with at least one handset manufacturer, and Dr. Taylor agreed that in some instances, Sprint's merchandise invoices did not reflect the amount Sprint paid for the handsets. It was not improper for plaintiff's counsel to suggest to the jury Sprint received discounts from handset manufacturers.

Sprint's sixth and seventh claims of attorney misconduct are premised on its claim that plaintiffs' counsel misrepresented various aspects of the components of reliance damages. For reasons we have explained, plaintiffs' counsel did not misstate the law regarding reliance damages, and did not misstate the evidence regarding when Sprint incurred the costs it sought as reliance damages. Finally, we reject Sprint's claim that plaintiffs' counsel committed misconduct during closing argument by urging the jury to reject Sprint's evidence because there was not "a single piece of paper" showing Sprint's damages. There was no misconduct here because plaintiffs' counsel immediately

36

corrected himself by saying, "I want to be completely fair to Mr. Baliban, because the rules are that you can't put an expert report into evidence." In any event, there is no indication Sprint rejected Baliban's testimony or declined to award reliance damages because Baliban's expert report was not in evidence. (*Garcia, supra,* 229 Cal.App.4th at p. 162; *Dominguez, supra,* 212 Cal.App.3d at p. 215.)

DISPOSITION

The order: (1) denying Sprint's motion for judgment notwithstanding the verdict; (2) granting Sprint's motion for new trial on Sprint's lost profits damages; and (3) denying Sprint's motion for new trial on reliance damages is affirmed. Each party is to bear its costs on appeal. (Cal. Rules of Court, rule 8.278.)

 

                                        _____

                                        Jones, P.J.

We concur:

_____

Simons, J.

_____

Bruiniers, J.